UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re: Case No. 11-60667

JAMAL S. KALABAT, Chapter 7

Debtor. Judge Thomas J. Tucker
___________________________________/

In re: Case No. 11-60831

SALAM KALABAT, Chapter 7

Debtor. Judge Thomas J. Tucker
___________________________________/

**OPINION REGARDING THE DEBTORS' MOTIONS ENTITLED "MOTION FOR CIVIL CONTEMPT AND TO ENFORCE DISCHARGE INJUNCTION"**

## I. Introduction

These two bankruptcy cases require the Court to decide whether certain claims, alleged in a state court lawsuit against two bankruptcy Debtors, were discharged in the Debtors' Chapter 7 bankruptcy cases.

In these cases, the Debtors, Jamal Kalabat and Salam Kalabat, each obtained a discharge. Several years later, the Kalabats (who are brothers) and others were sued in state court, by James A. Akouri and the James A. Akouri Living Trust (the "Akouri Parties"). After the parties litigated in state court for several months, the Akouri Parties filed a second amended complaint. The Kalabats now allege, in this Court, that the second amended complaint asserts claims that were discharged in their bankruptcy cases. The Akouri Parties deny this.

In each of these cases, the Debtor filed a motion entitled "Motion for Civil Contempt and to Enforce Discharge Injunction" (Docket # 53 in Case No. 11-60667 and Docket # 85 in Case

No. 11-60831) (together, the "Motions"). The Motions allege the same facts and involve the same issues. Each of the Motions seeks an Order finding the Akouri Parties in contempt, and awarding injunctive and monetary relief, for the Akouri Parties' alleged violations of the discharge injunction under 11 U.S.C. § 524(a)(2). The Akouri Parties oppose the Motions.

The Court held a joint hearing on the Motions, then permitted certain post-hearing filings and briefing by the parties. The Court then took the Motions under advisement.

The Court has considered all the briefs and oral arguments of the parties, and the exhibits and other documents filed by the parties,[1] as well as the rest of the record in each of these bankruptcy cases. This Opinion and the orders to follow will constitute the Court's decision on the Motions. For the reasons stated in this Opinion, the Court will deny each of the Motions.

**II. Jurisdiction**

This Court has subject matter jurisdiction over these contested matters under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). These are core proceedings, under 28 U.S.C. § 157(b)(2)(O).

In addition, these contested matters each fall within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen (In re Trans-Industries, Inc.)*, 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). These are a proceedings "arising under title 11" because they are "created or determined by a statutory provision of title 11," *see id.*, including Bankruptcy Code

[1] Docket ## 53, 55, 77, 78, and 80 in Case No. 11-60667; Docket # 85, 87, 109, 111, and 113 in Case No. 11-60831.

§ 524(a)(2). And these are proceedings "arising in" a case under title 11, because they are proceedings that "by [their] very nature, could arise only in bankruptcy cases." *See Allard v. Coenen*, 419 B.R. at 27.

**III. Facts**

The following facts are undisputed.

**A. The 2007 loan, guaranties, and security agreement**

In 2007, one or both of the Akouri Parties loaned $250,000.00 to two Michigan limited liability companies, named K-LV Investment LLC and K 4 DEVELOPMENT LLC. The loan was evidenced by, among other things, a promissory note dated July 3, 2007 in the amount of $250,000.00 with a stated maturity date of July 3, 2009, under which the borrowers agreed to repay the stated amount, plus interest, by paying to the order of "James A. Akouri Living Trust, dated March 26, 2003."[2] Jamal Kalabat and Salam Kalabat each personally guaranteed payment of the loan and promissory note, in a written guaranty agreement dated July 3, 2007 (the "Guaranty Agreement").[3] That Guaranty Agreement expressly referred to and guaranteed payment of the $250,000 promissory note dated July 3, 2007, and the guarantees were expressly made by the Kalabats to "James A. Akouri Living Trust, dated March 26, 2003," which is

---

[2] An unsigned copy of the first three pages of this promissory note appears in the exhibits attached to the Motions in each case. (Docket # 53 in Case No. 11-60667, Exhibits at pdf pp. 32-34 of 74; Docket # 85 in Case No. 11-60831, Exhibits at pdf pp. 32-34 of 74). The identity of the two borrowers under the $250,000.00 loan and promissory note is stated in the second paragraph on page 1 of the guaranty agreement dated July 3, 2007, which the Kalabats both signed. A copy of that guaranty agreement (the "Guaranty Agreement"), which is titled "Continuing, Joint and Several Guaranty," appears in the exhibits attached to the Motions in each case. (Docket # 53 in Case No. 11-60667, Exhibits at pdf pp. 56-60 of 74; Docket # 85 in Case No. 11-60831, Exhibits at pdf pp. 56-60 of 74).

[3] As stated in footnote 2 above, a copy of the Guaranty Agreement is in the exhibits attached to the Motions in each case. *See* the record citations in footnote 2, above.

defined as "the 'Lender.'"[4]

To secure payment of the $250,000.00 loan and their guaranty obligations, Jamal Kalabat and Salam Kalabat each signed a written security agreement, entitled "Membership Interest Security and Pledge Agreement," dated July 2, 2007 (the "Security Agreements").[5] In the Security Agreements, the Kalabats each granted a security interest "in favor of JIMMY AKOURI," in (1) their membership interests in a limited liability company called "Birmingham Property, LLC;" and (2) their shares of stock in a corporation named Waterford Hotel, Inc.[6]

**B. The Kalabats' 2011 bankruptcy cases**

Jamal Kalabat and Salam Kalabat each filed a Chapter 7 bankruptcy case in 2011, and each obtained a discharge of debts. Thus, the personal liability of Jamal Kalabat and Salam Kalabat to the Akouri Parties, under the 2007 Guaranty Agreement, was discharged in the bankruptcy cases, in 2011.

**C. The state court lawsuit filed in 2015 by the Akouri Parties**

Several years later, on November 4, 2015,[7] the Akouri Parties filed a lawsuit in the Oakland County, Michigan Circuit Court, captioned *James A. Akouri, Individually, and James A.*

---

[4] *See* Guaranty Agreement at p. 1, first and second paragraphs and at p. 3 ¶ 8.

[5] A copy of the two security agreements (the "Security Agreements"), each of which is titled "Membership Interest Security and Pledge Agreement," appear in the exhibits attached to the Motions in each case. (Docket # 53 in Case No. 11-60667, Exhibits at pdf pp. 36-55 of 74; Docket # 85 in Case No. 11-60831, Exhibits at pdf pp. 36-55 of 74).

[6] *See also* Amended Schedule D (Docket # 31 in Case No. 60667); Amended Schedule D (Docket # 32 in Case No. 11-60831). Copies of these amended Schedules are included in the exhibits attached to the Motions.

[7] This filing date for the state court lawsuit is derived from the docket sheet attached as Exhibit E-1 to the Supplemental Brief filed in each case by the Akouri Parties (Docket # 78 in Case No. 11-60667; Docket # 111 in Case No. 11-60831).

*Akouri Living Trust vs. Birmingham Property, LLC, et al.*, (Case No. 2015-150003-CB, the "State Court Case"). The defendants were Jamal Kalabat and Salam Kalabat, and others. After several months of litigation, on May 13, 2016, the Akouri Parties filed a second amended complaint (the "Second Amended Complaint"), containing eight counts.[8] Five of these counts (Counts I, II, III, VII, and VIII) stated claims against Jamal Kalabat and Salam Kalabat. The three other counts stated claims against an attorney named Laith Yaldoo (Counts IV, V, and VI).

The Kalabats argue that in asserting the five counts against the Kalabats in the Second Amended Complaint, the Akouri Parties sought to collect on the pre-petition debt of the Kalabats under their 2007 Guaranty Agreement of the $250,000.00 loan made by the Akouri Parties. As a result, the Kalabats argue, this action by the Akouri Parties sought to collect on debts that had been discharged in the Kalabats' 2011 bankruptcy cases.

It is therefore necessary to describe these counts in the Second Amended Complaint.

**Count I**

Count I of the Second Amended Complaint alleges a claim that the Kalabats converted the Akouri Parties' collateral, in the form of the membership interests in Birmingham Property, LLC, which the Kalabats pledged in 2007 as security for their loan guaranties. This count seeks damages for the conversion, including treble damages under Mich. Comp. Laws § 600.2919(a).

Count I alleges that this alleged conversion occurred on or after October 13, 2015, when the Akouri Parties sought to collect on the $250,000.00 loan made in 2007, which was in default. The Akouri Parties sought to realize on their collateral, in the form of the Kalabats' pledged

[8] A copy of the Second Amended Complaint is attached to each of the Motions as an exhibit. (Docket # 53 in Case No. 11-60667, Exhibits at pdf pp. 12-22 of 74; Docket # 85 in Case No. 11-60831, Exhibits at pdf pp. 12-22 of 74).

membership interest in Birmingham Property, LLC. This count alleges that on October 13, 2015, the Akouri Parties "sent a notice of default" to Birmingham Property, LLC, directing it to "register the membership interest of Defendants Kalabat in the name of [the Akouri Parties]," and notified Birmingham Property, LLC that "[the Akouri Parties] were entitled to, among other things, receive all distributions and exercise all voting rights relating to the membership interests of Defendants Kalabat in [Birmingham Property, LLC]."[9] Count I then alleges that the Kalabats caused "distributions and/or other payments that should have been paid" to the Akouri Parties instead to be paid to an entity owned or controlled by the Kalabats.[10] By this conduct, Count I alleges, the Kalabats converted property of the Akouri Parties for their benefit.

**Count II**

Count II alleges a claim of unjust enrichment against the Kalabats, based on the same facts stated in Count I.

**Count III**

In Count III of the Second Amended Complaint, the Akouri Parties seek to foreclose on their security interest in the Kalabats' shares of stock in Waterford Hotel, Inc., because of the default on the $250,000.00 loan. This count seeks an order directing that the stock be sold, and that the proceeds be applied to pay the $250,000.00 loan, plus interest and attorney fees.[11]

**Count VII**

Count VII of the Second Amended Complaint seeks damages for an alleged breach of

---

[9] Second Amended Complaint at ¶ 14.

[10] *Id.* at ¶ 15.

[11] *Id.* at ¶¶ 27-28.

contract by the Kalabats. This count alleges that the Kalabats made an agreement with the Akouri Parties in May 2015, under which the Kalabats agreed to pay the Akouri Parties $250,000.00 "by May 16, 2016," in exchange for unspecified "consideration" given to the Kalabats by the Akouri Parties.[12] This count then alleges that the Kalabats have not paid any part of the $250,000.00, but instead "have repudiated their obligations to do so."[13]

The Second Amended Complaint does not specify what the "consideration" was for the alleged May 2015 agreement. But the allegation that "consideration" was given by the Akouri Parties clearly implies that they gave something of value, rather than a mere release of the Kalabats' personal liability for their pre-petition debt under their 2007 Guaranty Agreement. That personal liability had been discharged in the Kalabats' bankruptcy cases in 2011, so a release of it in 2015 clearly would not constitute "consideration" as that word is used in the Second Amended Complaint.

Although the Second Amended Complaint does not specify what the "consideration" was for the alleged May 2015 agreement, the Akouri Parties have made clear what it was, in their written response to the Kalabats' Motions and in the hearing on the Motions. They say that the Kalabats' May 2015 promise to pay $250,000.00 was in exchange for the Akouri Parties' releasing their lien in the Kalabats' membership interests in Birmingham Property, LLC. After the Akouri Parties released that lien, they say, the Kalabats failed to pay the promised $250,000.00.

In their written responses to the Kalabats' Motions, the Akouri Parties stated:

---

[12] *Id.* at ¶¶ 54-55.

[13] *Id.* at ¶¶ 54, 55, 57.

> Years after receiving a discharge, in May, 2015, [each of] the Debtor[s] sought to obtain clear title to his equity in Birmingham Property, LLC. As a result, the Debtor[s] offered $250,000 in exchange for the Akouri Parties release of their lien in Birmingham Property, LLC. The Akouri Parties, acting in reliance on the Debtor's offer, released their lien. However, no payment was forthcoming.[14]

Counsel for the Akouri Parties reiterated that this is their breach of contract theory, during the hearing on the Motions.[15] And the Kalabats do not dispute that this is what the Akouri Parties are alleging in their breach of contract claim in Count VII of the Second Amended Complaint.

**Count VIII**

Count VIII seeks reformation of the Security Agreements signed by the Kalabats in 2007. This Count states:

> 60. The pledge agreements executed in 2007 for [the Akouri Parties'] benefit pertinent to [the Akouri Parties'] loan and security for its repayment refer to "Jimmy Akouri", whereas the pertinent promissory note and guarantee refer to the "James A. Akouri Living Trust."
>
> 61. In that respect, those documents do not express the true intent of the parties.
>
> 62. In order to express the true intent of the parties, the Court can and should reform those documents so that they refer to "James A. Akouri, individually and as trustee of the James A. Akouri Living Trust" or, alternatively, reform the pledge agreements so that they refer and inure to the benefit of that trust and trustee.[16]

**IV. Discussion**

---

[14] Docket # 55 in Case No. 11-60667 at 1; Docket # 87 in Case No. 11-60835 at 1.

[15] *See* Hearing Tr. (Docket # 82 in Case No. 11-60667) at 31, 37-39.

[16] Second Amended Complaint at ¶¶ 60-62.

**A. Applicable law — general principles**

Initially, the Court reiterates certain basic points of law about the Chapter 7 discharge injunction and the relief available for a violation of that injunction. As this Court stated in the recent case of *Schubiner v. Zolman* (*In re Schubiner*), ___ B.R. ___, Adv. No. 17-4677, 2018 WL 4489454, at *26-27 (Bankr. E.D. Mich., September 18, 2018):

> This Court discussed the law applicable to a violation of the discharge injunction in the case of *Holley v. Kresch Oliver, PLLC* (*In re Holley*), 473 B.R. 212 (Bankr. E.D. Mich. 2012):
>
> > Plaintiff seeks relief for Defendants' violations of the discharge injunction contained in Bankruptcy Code § 524(a)(2). That section states:
> >
> > > (a) A discharge in a case under this title—
> > > . . .
> > >
> > > (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [debt discharged under section 727] as a personal liability of the debtor, whether or not discharge of such debt is waived[.]
>
> 11 U.S.C. § 524(a)(2). The Sixth Circuit has held that no private right of action exists under 11 U.S.C. § 524 for a violation of the discharge injunction. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 422–23 (6th Cir.2000). Rather, bankruptcy courts enforce § 524 through civil contempt proceedings. *See id.* at 422; *see also Gunter v. Kevin O'Brien & Assocs. Co. LPA (In re Gunter*), 389 B.R. 67, 71 (Bankr. S.D. Ohio 2008)(citing *Pertuso*, 233 F.3d at 421)("[A] debtor's only recourse for violation of the discharge injunction is to request that the offending party be held in contempt of court.").
>
> Bankruptcy courts have civil contempt powers. Those

powers "flow from Bankruptcy Code § 105(a) and the inherent power of a court to enforce compliance with its lawful orders." *In re Walker*, 257 B.R. 493, 496 (Bankr. N.D. Ohio 2001) (citations omitted). The United States Court of Appeals for the Sixth Circuit has held that:

> > In a civil contempt proceeding, the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order.
> >
> > A litigant may be held in contempt if his adversary shows by clear and convincing evidence that "he violate(d) a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order."
>
> It is the petitioner's burden . . . to make a prima facie showing of a violation, and it is then the responding party's burden to prove an inability to comply. . . .
>
> > [T]he test is not whether [respondents] made a good faith effort at compliance but whether "the defendants took all reasonable steps within their power to comply with the court's order."
> >
> > [G]ood faith is not a defense to civil contempt. Conversely, impossibility would be a defense to contempt, but the [respondent] had the burden of proving impossibility, and that burden is difficult to meet.

*Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998)(citations omitted); *see also Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 550 (6th Cir. 2006); *Elec. Workers Pension Trust Fund of*

*Local Union # 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003).

> In the context of a violation of the discharge injunction, this means that the act must have been willful. The question of whether the violation is willful is based on whether the creditor intended the acts that constituted the violation. The standard does not require proof that the creditor deliberately violated the injunction. Thus, a debtor who alleges a violation of § 524(a)(2) must establish by clear and convincing evidence (1) the creditor violated the discharge injunction and (2) the creditor did so with actual knowledge of the injunction.

*In re Frambes*, No. 08-22398, 2012 WL 400735, at *5 (Bankr. E.D. Ky. Feb. 7, 2012)(citations omitted).

If a bankruptcy court finds a creditor in civil contempt for violating the discharge injunction, the court may award the debtor *compensatory* damages, including attorney fees and costs. *In re Johnson*, 439 B.R. 416, 428 (Bankr. E.D. Mich. 2010), *aff'd on other grounds*, No. 10-14292, 2011 WL 1983339 (E.D. Mich. May 23, 2011); *Gunter*, 389 B.R. at 71-72; *In re Perviz*, 302 B.R. 357, 370 (Bankr. N.D. Ohio 2003).

473 B.R. at 214-15 (italics in original).

This Court has discretion in deciding whether to award relief, including monetary relief, for a violation of the discharge injunction. *See, e.g.*, *Badovick v. Greenspan* (*In re Greenspan*), 464 B.R. 61, No. 10-8019, 2011 WL 310703, at *5 (B.A.P. 6th Cir. 2011) (internal quotation marks and citation omitted) (the court has "broad discretion . . . in selecting an appropriate sanction" for a violation of the discharge injunction); *In re Perviz*, 302 B.R. 357, 370, 370 n. 4 (Bankr. N.D. Ohio 2003) (sanctions and monetary relief for violations of the discharge injunction are discretionary); *Mitchell v. Anderson* (*In re Mitchell*), 545 B.R. 209, 227-28 (Bankr. N.D. Ohio 2016) (damages for violation of the discharge injunction are "within the Court's discretion;" and holding that even if the defendant violated the discharge injunction, the court would not award any damages to the debtor under the circumstances of that case).

**B. The discharge injunction does not prohibit a creditor's efforts to enforce and collect on a post-petition debt, or a creditor's efforts to enforce and collect on a lien securing a pre-petition debt, unless the lien was avoided during the Chapter 7 bankruptcy case.**

**1. No discharge of post-petition debts**

Jamal Kalabat filed his Chapter 7 case on July 29, 2011, and obtained his Chapter 7 discharge on November 15, 2011.[17] Salam Kalabat filed his Chapter 7 case on August 1, 2011, and obtained his Chapter 7 discharge on December 16, 2011.[18] Under Bankruptcy Code § 727(b), therefore, Jamal Kalabat obtained a discharge of all of his debts that "arose before" his petition date of July 29, 2011, and Salam Kalabat obtained a discharge of all of his debts that "arose before" his petition date of August 1, 2011 (the "pre-petition debts"). *See* 11 U.S.C. § 727(b).[19] For Jamal Kalabat and Salam Kalabat each, any debts that arose *after* his petition date ("post-petition debts"), were not discharged.

Under § 524(a)(2), the discharge injunction prohibits collection efforts on debts that were discharged. Since post-petition debts are not discharged, the discharge injunction does not bar efforts to collect post-petition debts.

**2. No discharge of any lien not avoided during the Chapter 7 bankruptcy cases**

Furthermore, under the wording of § 524(a)(2), the discharge injunction prohibits efforts to collect discharged, pre-petition debts only "as a personal liability of the debtor." If a creditor

---

[17] Voluntary Petition (Docket # 1 in Case No. 11-60667); Discharge Order (Docket # 45 in Case No. 11-60667).

[18] Voluntary Petition (Docket # 1 in Case No. 11-60831); Discharge Order (Docket # 59 in Case No. 11-60831).

[19] Under § 727(b), with certain exceptions not relevant here, the discharge applies to "all debts that arose before the date of the order for relief under this chapter, . . . ." In these cases, the date of the order for relief under Chapter 7 was the date on which each debtor filed his voluntary Chapter 7 bankruptcy petition. *See* 11 U.S.C. § 301(b).

had a lien to secure payment of a pre-petition debt before the Chapter 7 bankruptcy, that lien survives, or "rides through" the Chapter 7 bankruptcy and bankruptcy discharge, unless the lien is avoided in the bankruptcy case. And a creditor with such a lien may seek to enforce its lien rights and collect on its secured claim, sometimes called its "*in rem* claim," after discharge, even if the debtor's personal liability for the creditor's debt was discharged. As this Court explained in *In re Johnson*, 439 B.R. 416, 428 (Bankr. E.D. Mich. 2010), *aff'd. on other grounds*, 2011 WL 1983339 (E.D. Mich. 2011),

> [A] Chapter 7 bankruptcy discharge does not, in and of itself, discharge a creditor's lien. And actions that merely seek to enforce a creditor's surviving lien are not considered to be actions to collect a debt "as a personal liability of the debtor" within the meaning of the § 524(a)(2) discharge injunction.
>
>> It is firmly established that a lien "rides through" bankruptcy unaffected, unless the lien is disallowed or avoided. *Johnson v. Home State Bank,* 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991); *J. Catton Farms, Inc. v. First Nat'l Bank,* 779 F.2d 1242 (7th Cir.1985) (Liens pass through bankruptcy unaffected, meaning that a secured creditor may choose to ignore the bankruptcy proceeding and enforce his security interest); *Estate of Lellock v. Prudential Ins. Co.,* 811 F.2d 186 (3rd Cir.1987) (Although underlying debt was discharged in bankruptcy, the lien created before the bankruptcy against Debtor's property to secure that debt survived discharge where the lien was neither disallowed nor avoided); *Newman v. First Sec. Bank,* 887 F.2d 973 (9th Cir.1989) (If secured creditor chose not to file a claim or otherwise assert any interest in the security during the bankruptcy proceedings, the bankruptcy discharge has no effect on the lien); *accord In re Tarnow,* 749 F.2d 464, 466 (7th Cir.1984); *In re Braun,* 152 B.R. 466 (Bankr.N.D.Ohio 1993); *In re Hunter,* 164 B.R. 738 (Bankr.W.D.Ky.1994); *In re Kuebler,* 156 B.R.

1012 (Bankr.E.D.Ark.1993).

*In re Willis,* 199 B.R. 153, 154 (Bankr. W.D. Ky. 1995)

*See also In re Jackson*, 554 B.R. 156, 165 (B.A.P. 6th Cir. 2016), *aff'd.*, No. 16-4021, 2017 WL 8160941 (6th Cir. October 18, 2017) ("The discharge of personal obligations through a Chapter 7 discharge does not terminate a secured creditor's in rem rights unless the creditor's lien was avoided during the bankruptcy.")

**C. The alleged violations of the discharge injunction by the Akouri Parties**

Having considered all of the arguments of the parties, the Court concludes that none of the counts in the Second Amended Complaint seeks to collect or recover, "as a personal liability of" either of the Kalabats, on any debt that was discharged in the Kalabats' bankruptcy cases. The filing of the Second Amended Complaint, therefore, did not violate the discharge injunction under § 524(a)(2).

The Court will now discuss each of the relevant counts in the Second Amended Complaint, which are described in detail in Part III.C of this Opinion.

**1. Count III**

In Count III, the Akouri Parties seek to foreclose on their security interest in the Kalabats' shares of stock in Waterford Hotel, Inc., because of the default on the $250,000.00 loan. This count seeks an order directing that the stock be sold, and that the proceeds be applied to pay the $250,000.00 loan, plus interest and attorney fees.

This count merely seeks to enforce and realize upon a lien that the Akouri Parties claim to have in specific assets owned by the Kalabats. Any such lien "rode through" — *i.e.*, survived — the Kalabats' bankruptcy cases and discharges, because it was not avoided in either of the

bankruptcy cases under any of the various Bankruptcy Code provisions that permit the avoidance of liens.[20] An effort to enforce such a lien, even though it is done for the purpose of trying to collect on a pre-petition debt, is not prohibited by the § 524(a)(2) discharge injunction, because it is not considered an act to collect on a discharged debt "as a personal liability of the debtor." *See In re Johnson*, 439 B.R. at 428, quoted in Part IV.B above.

**a. The Kalabats' "no lien" argument**

The Kalabats contend that Count III violates the discharge injunction, for two reasons. First, they argue that neither of the Akouri Parties ever actually had a valid lien. This is so, the Kalabats say, because the 2007 Security Agreement purported to grant a security interest only to "Jimmy Akouri," and the Kalabats never owed any debt to Jimmy Akouri (aka James Akouri). Rather, the Kalabats' liability on their 2007 Guaranty Agreement was only a debt owing to the James A. Akouri Living Trust. In substance, the Kalabats argue that from the beginning, their 2007 Security Agreements *secured no debt at all*, because the Kalabats owed no debt to James Akouri individually.

From this premise, the Kalabats argue that Count III does not in fact seek to enforce a lien, even though it purports to do so, because there actually is no lien and there never was any lien. As a result, the Kalabats argue, Count III necessarily must be an effort to collect on the discharged debt under the 2007 Guaranty Agreement "as a personal liability of" the Kalabats. Put another way, the Kalabats argue, in substance, that Count III must be an effort to collect on what is in fact an *unsecured* debt that was discharged, so it violates the discharge injunction.

The Akouri Parties make at least three responses to the Kalabats' argument. One

---

[20] Such lien-avoidance provisions include 11 U.S.C. §§ 522(f), 544, 545, 547, 548, and 549.

response is to point to Count VIII of the Second Amended Complaint — the reformation count. That count is discussed in Part IV.C.2 of this Opinion, below.

Second, the Akouri Parties argue that because James Akouri was and is the Trustee of the James A. Akouri Living Trust, the Security Agreements' granting of liens to "Jimmy Akouri" should be considered a grant to James Akouri *in his representative capacity*, as Trustee of the James A. Akouri Living Trust. As such, it was a grant of liens to the Trust, not to James Akouri in his individual capacity. As analogous authority in support of this argument, the Akouri Parties cite Michigan's version of Section 9-503 of the Uniform Commercial Code, Mich. Comp. Laws Ann. § 440.9503. That section states rules for naming the debtor and the secured party in a financing statement. Among other things, it states that "[f]ailure to indicate the representative capacity of a secured party or representative of a secured party does not affect the sufficiency of a financing statement." Mich. Comp. Laws Ann. § 440.9503(4).

As further support of this argument by the Akouri Parties, the Court notes that given the circumstances, documents and facts described in Part III.A of this Opinion, it is clear that all of the parties — including the Kalabats and the Akouri Parties — intended for the 2007 Security Agreements to grant liens that secured payment of the Kalabats' guarantees of payment of the $250,000.00 promissory note, which was made payable to the James A. Akouri Living Trust. These parties obviously did not intend for the 2007 Security Agreements to secure *nothing*, which is the effect of the outcome now argued by the Kalabats.

The Akouri Parties make a third response to the Kalabats' argument. They argue that for purposes of determining if Count III violates the discharge injunction, it does not matter whether the count is meritorious; rather, it only matters whether the count *alleges* a claim to enforce a

lien, and seeks to enforce a lien.

The Court concludes that it is not necessary for *this Court* to decide the merits of the Kalabats' contention, that the 2007 Security Agreements were ineffective to actually grant any liens on the Kalabats' property. The Kalabats' argument is a possible defense to Count III of the Second Amended Complaint, which can and should be decided by the state court in the State Court Case, rather than by this Court. The key points for *this* Court are that (1) Count III clearly and expressly alleges a lien and seeks to enforce that lien, and does nothing more; and (2) if there is a lien as alleged in Count III, it clearly survived the Kalabats' bankruptcy discharges. These things are enough to establish that the Akouri Parties' pleading and prosecution of Count III in the State Court Case is not a violation of the discharge injunction.

**b. The Kalabats' "pretext" argument**

The Kalabats also argue that in pleading Count III, the Akouri Parties know that they have no hope of actually recovering any money by enforcing their claimed lien. They know this, say the Kalabats, because they know that a competing creditor, Larry Yaldoo, has a lien in the same assets claimed by the Akouri Parties as collateral, and that the state court had already ruled that Yaldoo's lien has priority over the lien claimed by the Akouri Parties. From this, the Kalabats argue that even if the Akroui Parties have a lien as they claim, they cannot hope to recover any money by enforcing the lien. For example, the Kalabats' argue that if their stock in Waterford Hotel, Inc. is sold, as Count III seeks, the proceeds of the sale all will go to Yaldoo, and the Akouri Parties will get nothing.

From this, the Kalabats argue that pleading and prosecuting Count III is merely a *pretext* by which the Akouri Parties are attempting to *coerce* the Kalabats into paying on the debt that

was discharged in their bankruptcy cases. As such, the Kalabats argue, Count III violates the discharge injunction.

In support of this argument, the Kalabats cite the bankruptcy court's decision in the case of *In re Jackson*, 539 B.R. 327 (Bankr. N.D. Ohio 2015), *rev'd. and vacated*, 554 B.R. 156 (B.A.P. 6th Cir. 2016), *aff'd.*, No. 16-4021, 2017 WL 8160941 (6th Cir. October 18, 2017). In that case, the bankruptcy court found that a creditor's action in foreclosing on a lien in the debtor's home could not hope to yield any money, because there was no equity to support the lien, and that because of this, the creditor's action was merely a pretext to coerce the debtor into paying a discharged debt. As a result, the bankruptcy court concluded that the creditor's action in enforcing its lien was a violation of the discharge injunction.

The Court finds the bankruptcy court's decision in *Jackson* unpersuasive, for several reasons. First, as counsel for the Kalabats acknowledges, the bankruptcy court's decision in *Jackson* was reversed by the Bankruptcy Appellate Panel of the Sixth Circuit. And that reversal by the B.A.P. was later affirmed by the Sixth Circuit. Both of these reviewing courts ruled that the bankruptcy court had abused its discretion in finding a violation of the discharge injunction.

Second, the Akouri Parties correctly point out that it is far from certain that they can obtain no money from foreclosing on their lien, as they seek to do in Count III. This is so because (1) the Akouri Parties dispute that Larry Yaldo has a lien that has priority over the Akouri Parties' lien, and even though the state trial court ruled against them on this issue on a partial summary disposition motion, they still have the right to appeal that disputed decision; (2) the original debt owing to Larry Yaldo has been paid in part, without liquidation of the collateral at issue (the Kalabats' shares of stock in Waterford Hotel, Inc.), and the current amount of that

debt is not yet established; and (3) the value of the collateral at issue — the Kalabats' shares of stock in Waterford Hotel, Inc. — has not been established. As the Bankruptcy Appellate Panel noted in *Jackson*, "the sale price for a foreclosure cannot be known until the sale actually occurs." *Jackson*, 554 B.R. at 166. From all of this, it is far from certain that the value of the collateral at issue in Count III is not high enough to pay anything on the Akouri Parties' lien, even if that lien is treated as junior to the Yaldo lien.

Third, the Court rejects the Kalabats' "pretext" theory in any event. The theory assumes that a lien creditor's action can violate the discharge injunction simply because it is intended to coerce, and/or that has the effect of coercing, a debtor into paying on a discharged debt. That is a false assumption, because *every* action of enforcing a lien after discharge has such intent and effect. As the Bankruptcy Appellate Panel noted in the *Jackson* case,

> *[A]ll* foreclosure litigation potentially can induce payments of discharged debt to avoid a foreclosure sale, . . ..
> . . .
>
> [A]ny exercise of in rem rights includes either the intended or unintended consequence of requiring the debtor to voluntarily cure arrearages, including prepetition arrearages, or face the loss of the collateral.

554 B.R. at 165, 167 (italics in original). If such a coercive intent or effect were enough to establish a violation of the discharge injunction, no creditor whose lien survived a discharge could ever enforce such lien. But this is clearly not the law, as case law shows. *See* Part IV.B of this Opinion.

Moreover, if the Kalabats' "pretext" theory were adopted, it could limit or prohibit a lien creditor's exercise of its *in rem* rights in a way that is inconsistent with applicable state law. On

the one hand, *if* applicable state law permits a junior lien creditor to foreclose on a lien even when that will only result in senior lienholders getting paid, then such creditor's right to foreclose in that circumstance is part and parcel of the rights that the junior lien creditor has by virtue of having its lien on the debtor's property. And such lien rights survive the debtor's bankruptcy discharge, unless the lien is avoided in the bankruptcy case. Enforcing such *in rem* rights therefore is not prohibited by the discharge injunction. On the other hand, *if* applicable state law does *not* permit a junior lien creditor to foreclose on a lien when it will yield no money to that creditor, then the creditor's effort to foreclose will fail on the merits under state law. Either way, however, what the lien creditor has done is merely attempt to exercise *in rem* rights as a lien creditor of the debtor. That attempt is not an act to collect a discharged debt "as a personal liability of the debtor" under § 524(a)(2).

The parties have not briefed or argued about whether Michigan law would permit the Akouri Parties to force a sale of their collateral under Count III, if such a sale would not yield them any money. And, as noted above, it is far from certain that such a sale under Count III would not yield any money for the Akouri Parties. It is for the state court to decide these issues. This bankruptcy court is not the proper court to decided these things, because they are not relevant to deciding whether Count III violates the discharge injunction. It does not.

**2. Count VIII**

As described in more detail in Part III.C of this Opinion, Count VIII seeks reformation of the Security Agreements signed by the Kalabats in 2007. This count obviously is pleaded in support of Counts I and III, which counts are based on the allegation that under the 2007 Security Agreements, the Akouri Parties have a valid lien in the Kalabats' property. If the state court

should decide that the naming of the secured party as "Jimmy Akouri" in the Security Agreements would otherwise render the claimed security interests invalid, Count VIII seeks reformation of the Security Agreements, to expressly name the secured party as the James A. Akouri Living Trust.

The Kalabats argue that in seeking such reformation of the 2007 Security Agreements, Count VIII seeks to create a lien that did not exist as of the dates in 2011 when the Kalabats filed their bankruptcy petitions. They argue that this cannot be done, and even if somehow it could be done now, years after the petition dates, the action of the Akouri Parties in seeking such reformation is an effort to collect on an unsecured, pre-petition debt that was discharged in their bankruptcy cases. The Court must reject the Kalabats' arguments about Count VIII.

Under Michigan law, reformation is an equitable remedy that makes the language in a written contract or instrument conform to what the court finds was in fact the agreement of the parties. *See generally Ross v. Damm*, 260 N.W. 750, 753 (Mich. 1935) (Under Michigan common law, where a contract or instrument "does not express the true intent of the parties, equity will reform the instrument so as to express what was actually intended."). Reformation does not create a new contract or new rights; it merely recognizes contractual rights that are deemed to have existed from the beginning. For example, in *Howell v. State Farm Fire & Cas.Co.*, No. 12-14406, 2014 WL 840094 (E.D. Mich. March 4, 2014) the court stated the following:

> Reformation does not create a new contract, but rather makes the written manifestation of the parties' original agreement correspond with their intentions. 76 C.J.S. *Reformation of Instruments* § 100. It follows then that the reformation of a contract relates back to the date the original contract was executed. *Lee State Bank v.*

> *McElheny*, 227 Mich. 322, 198 N.W. 928, 930 (Mich. 1924) ("Reformation relates back to the date of the mortgage."); *see also* 76 C.J.S. *Reformation of Instruments* § 101 ("[T]he reformation of an instrument relates back to the time of the original execution of such instrument."); 366 Am.Jur.2d *Reformation of Instruments* § 9.

*Id.* at * 3.

In this case, the state court could order the type of reformation sought by Count VIII if the court found that the Kalabats and the Akouri Parties all intended, in the 2007 Security Agreements, for the Kalabats to grant a security interest to the James A. Akouri Living Trust, which was the named lender of the $250,000.00 loan that the Kalabats guaranteed in their 2007 Guaranty Agreement, rather than to James Akouri individually. The intent of the parties to grant a security interest to the James A. Akouri Living Trust seems clear from the wording of the Guaranty Agreement signed by these parties, which is described in Part III.A of this Opinion. In any event, if the state court were to make such a finding about the intent of the parties, and reform the Security Agreements accordingly, that would merely confirm the existence and validity, from the beginning, of the security interests that the Kalabats granted to the James A. Akouri Living Trust in their 2007 Security Agreements. Thus, such reformation would not and could not *create* either a debt or a security interest; rather, such reformation merely would recognize that such debt or security interest had existed all along.

The Kalabats argue that reformation cannot be used post-petition, to convert a pre-petition unsecured creditor into a secured creditor. As they put it in their Motions, "[a] party cannot reform a document after the filing of a bankruptcy. The parties' rights are fixed as of the petition date, and an unsecured creditor cannot 'fix' items postpetition so that it can become a

secured creditor."[21] In support of this argument, the Kalabats cite *State Bank of Toulon v. Covey* (*In re Duckworth*), 776 F.3d 453 (7th Cir. 2014).

The *Duckworth* case is distinguishable from this case, and it actually supports the position of the Akouri Parties. *Duckworth* was a Chapter 7 case in which the trustee contended that a bank claiming a security interest was actually an unsecured creditor. Pre-petition, the debtor had borrowed $1.1 million from a bank, and had given the bank a promissory note and signed a security agreement. But the security agreement was dated two days before the loan was made and two days before the promissory note was dated and signed. And "[t]he security agreement said that it secured a note 'in the principal amount of $____ dated *December 13, 2008*.'" 776 F.3d at 455 (italics in original). By contrast, the promissory note was dated and signed on December 15, 2008, and there was no promissory note dated December 13, 2008. *Id.* Because of these discrepancies, the Chapter 7 trustee argued that the bank had no security interest, and had to be treated as an unsecured creditor.

The court of appeals agreed with the trustee, based on the trustee's avoiding powers under the so-called strong-arm provisions of 11 U.S.C. § 544(a). *Id.* at 458. The *Duckworth* court discussed reformation in this context. The court noted that "[t]he testimony of both the bank officer who prepared the documents and borrower Duckworth makes clear that the bank made a mistake in preparing the security agreement." *Id.* at 457-58. Then the court stated that "[w]e are confident that the bank would have been able to obtain reformation—even of an unambiguous agreement—against the original borrower if he had tried to avoid the security agreement based

---

[21] Motion (Docket # 53 in Case No. 11-60667) at ¶ 27; Motion (Docket # 85 in Case No. 11-60831) at ¶ 27.

on the mistaken date." *Id.* at 458 (citations omitted). Thus, the court recognized that the bank could have obtained reformation of the security agreement *against the bankruptcy debtor* (the original borrower), and thereby have secured status. But the court held that the bank could not use reformation, or parol evidence that would support reformation, *against the Chapter 7 trustee*. This was because unlike the debtor, the trustee had the strong-arm avoidance powers under § 544(a).[22] *See id.* at 458-59.

In the present cases, unlike *Duckworth*, the purportedly secured creditor does not seek to use reformation to correct an error in a security agreement *against a Chapter 7 trustee*, but rather, only against the bankruptcy debtors (the Kalabats). As noted above, the court of appeals in the *Duckworth* case clearly indicated that the creditor *can* seek and obtain reformation post-petition

---

[22] Section 544(a) states:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> > (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
> >
> > (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or
> >
> > (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a).

against the bankruptcy debtor, notwithstanding § 544(a).

The Chapter 7 trustees in the Kalabats' cases never tried to avoid any security interest. Reformation, as sought by the Akouri Parties in Count VIII, is not foreclosed by the *Duckworth* case, or by any provision of the Bankruptcy Code.

The Kalabats do not have the same strong-arm avoidance powers under § 544(a) as the Chapter 7 trustee. *Duckworth* itself indicates this, as discussed above. *See* 776 F.3d at 458. The Chapter 7 debtor's power to use *the trustee's* powers to avoid liens is granted by Bankruptcy Code § 522(h), 11 U.S.C. § 522(h). But such power is limited by the combination of §§ 522(g) and 522(h), so as to preclude the Chapter 7 debtor's use of the trustee's avoidance power under § 544(a) when the lien at issue was given as a voluntary transfer by the debtor. Sections 522(g) and (h) state:

> (g) Notwithstanding sections 550 and 551 of this title, **the debtor may exempt under subsection (b) of this section property that the trustee recovers under section** 510(c)(2), 542, 543, **550**, 551, or 553 of this title, to the extent that the debtor could have exempted such property under subsection (b) of this section if such property had not been transferred, **if**—
>
> (1)(A) **such transfer was not a voluntary transfer of such property by the debtor;** and
>
> (B) the debtor did not conceal such property; or
>
> (2) the debtor could have avoided such transfer under subsection (f)(1)(B) of this section.
>
> (h) **The debtor may avoid a transfer of property of the debtor** or recover a setoff **to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if**—
>
> (1) **such transfer is avoidable by the trustee under section 544**,

> 545, 547, 548, 549, or 724(a) of this title or recoverable by the trustee under section 553 of this title; **and**
>
> (2) **the trustee does not attempt to avoid such transfer.**

11 U.S.C. §§ 522(g), 522(h) (emphasis added). Because the Kalabats' granting of security interests under the 2007 Security Agreements was a voluntary transfer by them, they cannot seek to avoid such transfers using the Chapter 7 trustee's avoidance powers under § 554(a).

For all of the above reasons, the Akouri Parties' reformation count, Count VIII, is not precluded by the Bankruptcy Code, nor is it a violation of the discharge injunction. Rather, it is merely part of the Akouri Parties' effort to enforce the liens that they claim to have had at all times from 2007 on, in the Kalabats' membership interests in Birmingham Property, LLC and in the Kalabats' shares of stock in Waterford Hotel, Inc. Therefore, Count VIII cannot be viewed as an effort by the Akouri Parties to collect on a discharged debt "as a personal liability" of the Kalabats.

**3. Counts I and II**

Counts I and II are described in detail in Part III.C of this Opinion. Both counts allege a claim that arose on or after October 13, 2015, more than four years after the Kalabats filed their 2011 bankruptcy cases. Count I is based on actions by the Kalabats that allegedly were done on or after October 13, 2015, which the Akouri Parties allege was a wrongful conversion of their collateral rights, based on their security interest in the Kalabats' membership interests in Birmingham Property, LLC. Count II is an unjust enrichment claim that is based on the same actions by the Kalabats alleged in Count I.

These clearly are post-petition claims, and as such they were not discharged in the

Kalabats' 2011 bankruptcy cases. As noted earlier, the Kalabats contend that the Akouri Parties had no valid lien under the 2007 Security Agreements, and that the claims are meritless in any event because Larry Yaldoo had a lien in the same assets that had priority over any lien held by the Akouri Parties. If the Kalabats are correct about these things, that would give them a valid defense on the merits to Counts I and II. But it does not mean that the Akouri Parties are somehow asserting claims that arose before the 2011 petition dates in these bankruptcy cases. Rather, Counts I and II are post-petition claims that are part of the Akouri Parties' effort to enforce their in rem rights as secured creditors whose liens survived the Kalabats' bankruptcy discharge. Because these are post-petition claims that were not discharged, the assertion of them by the Akouri Parties does not violate the discharge injunction.

**4. Count VII**

As described in detail in Part III.C of this Opinion, Count VII alleges a breach of contract, based on an agreement allegedly made in May 2015, almost four years after the Kalabats filed their bankruptcy petitions. The Court concludes that this count alleges a claim that arose in or after May 2015, and therefore that it was a post-petition claim that was not discharged in the 2011 bankruptcy cases.

Count VII alleges that the Kalabats made an agreement with the Akouri Parties in May 2015, under which the Kalabats agreed to pay the Akouri Parties $250,000.00 "by May 16, 2016," in exchange for "consideration." The consideration allegedly given for this alleged promise to pay by the Kalabats was the Akouri Parties' release of their lien in the Kalabats' membership interests in Birmingham Property, LLC. After the Akouri Parties released that lien, they say, the Kalabats failed to pay the promised $250,000.00 and repudiated their agreement.

The Kalabats argue that even though this alleged agreement was made in May 2015, it amounts to a "post-discharge promise to pay a prepetition claim" that was discharged,[23] and that an attempt to enforce such a promise violates the discharge injunction. In support of this argument, the Kalabats cite *Close v. Edison* (*In re Close*), Adv. No. 03-0153, 2003 WL 22697825 (Bankr. E.D. Pa., October 29, 2003). But that case is quite unlike this case.

In *Close*, the creditor made an unsecured loan of $35,000 to the debtor, who later filed bankruptcy. The pre-petition unsecured loan was discharged in the debtor's bankruptcy case. Later, the creditor filed suit in state court to obtain repayment of the loan. The debtor then filed an adversary proceeding in the bankruptcy court, alleging that the creditor's lawsuit violated the discharge injunction. One of the creditor's arguments to the bankruptcy court was that the debtor had made several post-discharge oral promises to repay the $35,000 debt. The creditor argued that these promises were valid post-petition agreements under state law, supported by new consideration. But the only alleged new consideration for the debtor's post-discharge promises to pay was "a moral obligation to pay a discharged debt." *Close*, 2017 WL 22697825, at *7. The creditor cited "several old Pennsylvania cases for the proposition that a post-discharge promise to pay a prior debt can be enforced under Pennsylvania law which recognizes that a moral obligation to pay a discharged debt forms sufficient consideration to make the promise binding." *Id.* (citations omitted).

The court in *Close* held that where the consideration for a post-discharge promise to pay is in whole or in part a discharged pre-petition debt, the Bankruptcy Code's requirements

---

[23] Motion (Docket # 53 in Case No. 11-60667) at ¶ 22; Motion (Docket # 85 in Case No. 11-60831) at ¶ 22.

applicable to reaffirmation agreements, 11 U.S.C. §§ 524(c) and 524(d), must be met in order for the promise to be enforceable. *Id.* at *8. The court held that seeking to enforce a post-petition promise to pay such a debt without meeting the reaffirmation agreement requirements would violate the discharge injunction. *See id.* at *9.

The court in *Close* acknowledged, but distinguished, several reported cases in which a debtor made a post-discharge agreement to pay money in exchange for a secured creditor giving up, in whole or in part, the enforcement of lien rights that survived the bankruptcy discharge. *Id.* at *8-9. In those cases, *Close* reasoned, the debtors "entered into valid post-discharge agreements in which they exchanged payment for something of value, neither of which was based 'in whole or in part' on the discharged debt." *Id.* at 9. Trying to collect on the debt in those cases is not considered to be enforcing a discharged pre-petition debt, but rather is considered to be enforcing a post-petition debt that was not discharged. *See id.*

In this case, the Akouri Parties allege that in exchange for the Kalabats' May 2015 promise to pay $250,000.00, they agreed to, and did, release their lien in the Kalabats' membership interests in Birmingham Property, LLC, a lien that survived the Kalabats' 2011 bankruptcy cases. That claim, in Count VII, clearly states a post-petition claim that was not discharged in the Kalabats' 2011 bankruptcy cases. The filing and pursuit of that claim by the Akouri Parties therefore did not violate the discharge injunction.

The Kalabats make certain other arguments that could be defenses to Count VII on the merits. These include (1) a denial that they made the May 2015 agreement alleged by the Akouri Parties; and (2) a denial that the lien that the Akouri Parties released was a valid lien. These and other possible defenses are for the state court to decide, not this Court. They do not bear on

whether the breach of contract claim in Count VII is a post-petition claim. It is, so it was not discharged.

**V. Conclusion**

For the reasons stated in this Opinion, the Court concludes that the Akouri Parties have not violated the discharge injunction arising in the Kalabats' bankruptcy cases. So the Court will enter an order in each of these bankruptcy cases, denying the Debtor's Motion.

**Signed on October 19, 2018**




**/s/ Thomas J. Tucker**

**Thomas J. Tucker**
**United States Bankruptcy Judge**